UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STEVEN E. UHR,                                    Case No. 10-CV-4945 (PJS/TNL)

        Plaintiff,

v.

RESPONSIBLE HOSPITALITY                           ORDER
INSTITUTE, INC.; JIM PETERS; DIAGEO
NORTH AMERICA, INC.; GARY ZIZKA;
AMERICAN BEVERAGE LICENSEES,
INC.; JOHN D. BODNIVICH; DISTILLED
SPIRITS COUNCIL OF THE UNITED
STATES, INC.; WINE AND SPIRITS
WHOLESALERS OF AMERICA, INC.;
INTERNATIONAL DOWNTOWN
ASSOCIATION; APPLEBEE'S
INTERNATIONAL INC.; FAMOUS
DAVE'S OF AMERICA, INC.; CHILI'S OF
MINNESOTA INC.; PRUDENTIAL
FINANCIAL, INC.; CITIBANK, N.A.;
RICHARD A. YOAST; JAMES F.
MOSHER; ROBERT H. BRUININKS;
NATIONAL BEER WHOLESALERS
ASSOCIATION; RICHARD LYSHEK;
RICK PETRI; JAY WANSERSKI; LUBY'S
FUDDRUCKERS RESTAURANTS, LLC,

        Defendants.

---

Steven E. Uhr, plaintiff pro se.

David A. Schooler, Ellen A. Brinkman, Ankoor Bagchi, BRIGGS & MORGAN,
PA, for defendants Responsible Hospitality Institute, Inc., Jim Peters, American
Beverage Licensees, Inc., International Downtown Association, and John D.
Bodnivich.

Andrew M. Luger, Bethany D. Krueger, Erin Sindberg Porter, GREENE ESPEL
P.L.L.P.; D. Bruce Hoffman, HUNTON & WILLIAMS LLP, for defendants Diageo
North America, Inc. and Gary Zizka.

Thomas P. Kane, Shushanie E. Kindseth, HINSHAW & CULBERTSON LLP, for defendant Distilled Spirits Council of the United States, Inc.

William L. Greene, Peter J. Schwingler, LEONARD STREET AND DEINARD, PA, for defendant Wine and Spirits Wholesalers of America, Inc.

Alain M. Baudry, MASLON EDELMAN BORMAN & BRAND, LLP, for defendants Applebee's International Inc., Famous Dave's of America, Inc., and Chili's of Minnesota Inc.

Justi R. Miller, Barbara P. Berens, BERENS & MILLER, P.A., for defendant Prudential Financial, Inc.

Mark G. Schroeder, Kevin M. Decker, BRIGGS & MORGAN, PA, for defendant Citibank, N.A.

Mark R. Whitmore, BASSFORD REMELE, for defendant Richard A. Yoast.

Michael D. Madigan, Richard M. Dahl, Jon R. Steckler, MADIGAN DAHL & HARLAN, PA, for defendants James F. Mosher and National Beer Wholesalers Association.

Brian J. Slovut, UNIVERSITY OF MINNESOTA, for defendant Robert H. Bruininks.

Richard A. Lyshek, defendant pro se.

Robert E. Salmon, Megan D. Yelle, MEAGHER & GEER, P.L.L.P., for defendant Rick Petri.

Joshua L. Johanningmeier, Kendall W. Harrison, GODFREY & KAHN, for defendant Jay Wanserski.

Jonathan D. Wilson, DORSEY & WHITNEY LLP, for defendant Luby's Fuddruckers Restaurants, LLC.

Plaintiff Steven Uhr is a man on a mission.  Some years ago, he discovered the existence of what he believes to be a vast nationwide conspiracy — involving literally thousands of entities and individuals — to bring an end to "happy hour" and other drink promotions and thereby increase the profit margins of bars and restaurants.  Since discovering this conspiracy,

Uhr has brought multiple lawsuits — first as an attorney representing others, now as a pro se plaintiff representing only himself — seeking to recover damages from the alleged conspirators.

Uhr has not been discouraged by the fact that, to date, all of his lawsuits have been dismissed.  Nor has Uhr been discouraged by the fact that he has no evidence that he personally has ever paid a penny more for a drink because of the alleged conspiracy.  Nor has Uhr been discouraged by the fact that many of those who he alleges are involved in this conspiracy — including medical doctors, police officers, educators, scientists, and charitable foundations dedicated to improving public health — would have no reason to join a conspiracy to help bars and restaurants increase their profits on liquor sales.  Nor has Uhr been discouraged by the fact that some of those who he alleges are central to the conspiracy — in particular, distillers, wholesalers, and distributors — would lose money if retailers raised drink prices and thereby lowered alcohol consumption.  Uhr plows ahead, filing lawsuit after lawsuit, seeking to force defendants who appear to have caused him no harm to pay him millions of dollars in damages.

In this action, Uhr brings antitrust and RICO claims against 22 defendants, including four chain restaurants with locations in Minnesota, the owners of several bars in Madison, Wisconsin, numerous national retail and wholesale alcohol and restaurant trade associations, the former head of alcohol policy at the American Medical Association, two major financial institutions, several attorneys, a nonprofit organization, and the president of the University of Minnesota.[1]  Although

---

[1]Defendant Robert H. Bruininks recently retired from his post as president of the University of Minnesota.  As Uhr avers that he sues Bruininks "in a representative capacity for injunctive relief only," Compl. ¶ 23, Bruinink's successor, Eric W. Kaler, has been substituted for Bruininks automatically by operation of Fed. R. Civ. P. 25(d).  Because the Court is dismissing this action with prejudice, however, it is not necessary to undertake the administrative task of substituting Kaler's name on the docket.

this lawsuit focuses on what Uhr believes to be the Minnesota "branch" of the nationwide conspiracy, Uhr has sued a seemingly random sampling of defendants who appear to have no connection to Minnesota but who, Uhr alleges, are nevertheless part of the nationwide conspiracy.  For example, Uhr has sued an attorney who allegedly brokered a deal regarding the sale of beer at "beer tents" during home football games at Camp Randall Stadium on the campus of the University of Wisconsin in 2002.  He has also sued Citibank, because the manager of one of its branch offices in San Diego, California, served on the board of a local trade association that allegedly supported a deal among a group of Pacific Beach bars to restrict drink specials in 2006.  Uhr does not allege that he bought beer at Camp Randall in 2002 or a drink in Pacific Beach in 2006, but he nonetheless alleges that the attorney and Citibank and thousands of others like them are liable to him.

This matter is before the Court on 20 motions to dismiss filed by the defendants.  Two defendants also bring motions for sanctions.  For the reasons stated below, the motions to dismiss are granted and the motions for sanctions are denied.[2]

## I.  BACKGROUND

The basis of Uhr's complaint is his allegation that there exists a huge nationwide conspiracy to fix the prices of alcoholic beverages at bars and restaurants throughout the United States and that the Minnesota "branch" of this conspiracy is carried out under the guise of

---

[2]Uhr also moves for leave to file a second amended complaint.  At the Court's request, defendants addressed the proposed second amended complaint in the briefs filed in support of their motions to dismiss.  The Court therefore grants Uhr's motion for leave to file a second amended complaint and treats it as the operative complaint for purposes of defendants' motions. All citations to the "complaint" in this order refer to the second amended complaint [Docket No. 136].  The Court thanks Uhr and the defendants for their cooperation in streamlining and coordinating what would otherwise have been an extraordinary amount of briefing.

research conducted by the Alcohol Epidemiology Program at the University of Minnesota's

School of Public Health.  It is difficult to overstate the scope of the conspiracy that Uhr alleges.

In addition to the University of Minnesota, other institutions infiltrated by the conspiracy include

(according to Uhr) the Robert Wood Johnson Foundation, the American Medical Association,

Harvard University, and the University of Wisconsin.  Compl. ¶ 102.  The alleged conspiracy

spans several decades and involves distillers, wholesalers, and distributors of wine, beer, and

spirits, as well as alcohol retailers all over the country.  According to Uhr, he was harmed by this

conspiracy when he purchased drinks at four restaurants in Minnesota: Applebee's, Chili's,

Fuddruckers, and Famous Dave's.  Compl. ¶ 88.

Uhr's complaint mostly consists of a scattershot list of what appear to be isolated

instances of businesses in various locales agreeing to various types of price restrictions on

alcoholic beverages.  But Uhr alleges that all of these incidents are part of the one massive

conspiracy.  According to Uhr, the common thread tying together all of these incidents is the

involvement of defendant Responsible Hospitality Institute, Inc. ("RHI").

## A.  RHI

RHI is a nonprofit organization headquartered in Santa Cruz, California.  Compl. ¶ 2.

Defendant Jim Peters has been the president of RHI since it was founded in 1983.  Compl. ¶¶ 3,

24.  According to its website, RHI "assists businesses and communities [to] create safe and

vibrant places to socialize."  Compl. ¶ 27.  RHI's board of directors includes a number of

individuals and trade associations in the alcohol industry, including eight of the defendants in

this action:

- Diageo North America, Inc. ("Diageo"), a subsidiary of the world's largest
  producer of beer, wine, and distilled spirits, Compl. ¶ 4;

- Gary Zizka, a vice president of Diageo who represents Diageo on RHI's board, Compl. ¶ 5;

- American Beverage Licensees, Inc. ("ABL"), a national trade association of over 20,000 off-premise and on-premise alcohol retailers, Compl. ¶ 6;

- John D. Bodnivich, the executive director of ABL, who represents ABL on RHI's board, Compl. ¶ 7;

- Distilled Spirits Council of the United States, Inc. ("DISCUS"), a national trade association representing the country's leading distillers, Compl. ¶ 8;

- Wine and Spirits Wholesalers of America, Inc. ("WSWA"), a national trade association representing the wholesale tier of the wine and spirits industry, Compl. ¶ 9;

- National Beer Wholesalers Association ("NBWA"), a national trade association representing the wholesale tier of the beer industry, Compl. ¶ 10; and

- International Downtown Association ("IDA"), a worldwide association of over 600 community-business trade associations, Compl. ¶ 11.

Four of the defendants on RHI's board (Diageo, DISCUS, WSWA, and NBWA) also underwrite RHI's activities.  Compl. ¶¶ 4, 8, 9, 10.

Uhr alleges that, under the guise of offering consulting services on "responsible beverage service" and "responsible hospitality," RHI in fact facilitates price-fixing agreements on retail alcohol sales in communities throughout the United States and Canada.  Compl. ¶¶ 24-25, 48.  In particular, RHI urges alcohol retailers not to serve discounted drinks and advocates the creation of "community covenants . . . to discourage this type of marketing practice."  Compl. ¶ 44.  RHI holds seminars and other events at which, Uhr alleges, it provides information on price-fixing methods to community leaders and owners and managers of licensed retailers.  Compl. ¶ 26.  For example, at a 2005 conference in Vermont, RHI personnel told attendees that "[p]rice competition in the hospitality industry" has consequences that are "not positive," that "[d]rink

specials often indicate an establishment that is in trouble," and that "[c]ollaboration between owners will help to discourage this type of price war."  Compl. ¶ 44.

Uhr identifies a 1989 video entitled "Responsible Beverage Service" as a "conspiracy training/recruitment video" that has been distributed to bar owners and managers throughout the United States.  Compl. ¶¶ 33-34; *see also* Uhr Aff. Ex. 1 [hereinafter "RBS Video"].  The RBS video was a coproduction of the Stanford Health Promotion Resource Center and the Marin Institute for the Prevention of Alcohol and Other Drug Problems.  RBS Video 00:28. Defendants Peters (RHI's president) and James Mosher also produced and appeared in the video.[3]  Compl. ¶ 33.  Mosher is a California attorney and the president of an organization called Alcohol Policy Consultations.  Compl. ¶ 22.  Mosher has spoken at RHI events and has worked with defendant Richard Yoast — who until recently was in charge of alcohol policy at the American Medical Association — in developing the AMA's alcohol policies.  Compl. ¶¶ 21-22, 31.

The RBS video advocates cooperation between the hospitality industry, public-health officials, and law-enforcement officials to raise awareness about the problems associated with excessive drinking.  The RBS video further advocates addressing these problems through the adoption of community standards and "responsible beverage service" training programs.  Twice during the 25-minute video, speakers mention drink promotions: (1) once when a speaker refers to a study done at the San Diego Naval Club, which found that server training and eliminating

---

[3]Uhr does not directly allege that RHI made or distributed the RBS video.  But Uhr implies a link between RHI and the RBS video by discussing the video in the midst of his allegations about RHI.  Apparently Uhr sees a link because RHI president Peters produced and appeared in the video and Mosher (who also produced and appeared in the video) has spoken at RHI events.

pitcher sales reduced rates of intoxication by 50 percent, RBS Video 12:21-13:03; and (2) once

when a bar manager, while discussing how to reduce sales to problem customers, says that "I

don't think that by selling more drinks or giving them away at two-for-one that you're really

doing yourself any good," RBS Video 19:55-20:04.

### B.  The Minnesota Conspiracy

Uhr alleges that the Minnesota branch of the conspiracy was conducted in part through

the Alcohol Epidemiology Program at the University of Minnesota's School of Public Health.

Compl. ¶¶ 49, 51.  The Alcohol Epidemiology Program administers an "alcohol risk

management" ("ARM") program which recommends that bars and restaurants adopt written

policies about alcohol service, and include as part of those policies the elimination of drink

promotions.  Compl. ¶¶ 49, 51.  Defendants Peters and Mosher consulted on the development,

implementation, and evaluation of the ARM program, Compl. ¶ 54, and attorneys, hospitality

businesses, and insurance agents were involved in developing the ARM program, Compl. ¶ 50.

In his complaint, Uhr cites two materials associated with the ARM program: a 1997

video entitled "ARM Yourself with Information" and an academic study of the effectiveness of

the ARM program published in 2008.  Compl. ¶¶ 55, 58; Slovut Aff. ¶¶ 2-3 & Ex. A [hereinafter

"Article"], Ex. B [hereinafter "ARM Video"].  The ARM video is part of a training package for

owners and managers of licensed establishments and is geared toward convincing those

establishments to adopt written policies that will prevent the serving of alcohol to underage or

intoxicated patrons.  Uhr alleges that the ARM video advocates that establishments agree to

restrictions on drink promotions, Compl. ¶ 55, but the only instance of such advocacy in the

video that Uhr can identify is a dramatized staff meeting in which restaurant workers are shown

discussing alcohol policies and a document containing such policies is displayed on screen for approximately two seconds.  It is impossible to read the document while watching the video, but if the video is paused, it is possible to discern that the policies described in the document include restrictions on drink promotions.  ARM Video 6:41.  Uhr alleges that, like the RBS video, the ARM video is a "conspiracy training/recruitment" video.[4]  Compl. ¶ 55.

In 2008, University of Minnesota researchers (along with researchers from several other academic institutions) published the results of a study that they had conducted of the ARM program's effectiveness in reducing the sale of alcohol to obviously intoxicated patrons and in increasing the adoption of alcohol policies and practices.  Article 406.  The study worked as follows:  Researchers randomly assigned licensed establishments either to a full version of the ARM program (which involved four one-on-one training sessions with the establishment's manager) or to an abridged version (which involved only one training session).  Article 406.  Trainers were people with experience in the hospitality industry.  Compl. ¶ 50; Article 406.  All training was completed between September 2002 and August 2004.  Article 406.

The trainers recommended 18 alcohol-control policies, each of which the establishments were free to adopt or reject.  Article 409, 411.  One of the 18 recommended policies was to prohibit drink promotions.  Article 411.  Of the establishments who participated in the full training, 55 percent fully implemented the recommendation to prohibit drink promotions, and an additional 17 percent partially implemented that recommendation.  Article 411.  On average, the establishments that participated in the full training adopted 13 of the 18 recommended policies.

---

[4]Uhr previously brought a pro se state-court antitrust action under Minnesota law based at least in part on the ARM video.  *See* Baudry Decl. Ex. 1 (November 1, 2010 order granting defendants' motions for judgment on the pleadings).

Article 409.  But a followup survey found no differences in reported policies between participating establishments and establishments that did not participate in any training at all, Article 411, and the researchers did not know whether the participating establishments enforced the policies after training concluded, Article 410.  Nevertheless, Uhr alleges that "[m]any licensed establishments in the [T]win [C]ities still follow and abide by the ARM pricing restrictions."  Compl. ¶ 59.

Approximately 230 Minnesota establishments agreed to participate in the study, including Applebee's, Chili's, Fuddruckers, and Famous Dave's.  Compl. ¶¶ 53, 56; Article 405. Uhr alleges that, as a result of their participation in the ARM training, Applebee's, Chili's, Fuddruckers, and Famous Dave's all agreed to and did eliminate or reduce drink discounts. Compl. ¶ 56.  Uhr further alleges that he purchased alcoholic beverages from Applebee's, Chili's, Fuddruckers, and Famous Dave's in the Twin Cities during the course of the conspiracy. Compl. ¶ 88.  Although Applebee's, Chili's, and Famous Dave's all have multiple locations in the Twin Cities, Compl. ¶¶ 12-14, Uhr does not allege which particular locations were involved or where in particular he bought his drinks.  Uhr also does not allege *when* he bought his drinks, other than that it was "during the course of the charged conspiracy."  Compl. ¶ 88.  At oral argument, when asked which of these restaurants have failed to offer him a drink special since they participated in the ARM program, Uhr admitted that he did not know.  In other words, Uhr admitted that he does not know whether he has ever paid more for a drink because the restaurants that he has sued participated in the ARM program.

*C.  Price Fixing in Other States*

As noted, Uhr also alleges a number of price-fixing agreements in other states which, like the ARM program, are part of the same nationwide conspiracy.  Specifically, Uhr alleges price fixing in Milwaukee, Wisconsin; Madison, Wisconsin; Hollywood, California; San Diego, California; and Breckenridge, Colorado.

### 1.  Milwaukee

In 1995, approximately 18 grocery and convenience stores in Milwaukee agreed to fix minimum prices on 40-, 32-, and 20-ounce beer bottles.  Compl. ¶ 82 & Ex. 6.  The connection between this incident and the alleged nationwide conspiracy facilitated by RHI is not explained.  But Uhr also alleges that, in 2009, the Milwaukee Downtown Business Improvement District hired RHI to facilitate collusion among licensed establishments in Milwaukee.  Compl. ¶ 83.  Uhr does not allege that any actual price fixing resulted.

### 2.  Madison

In September 2002, approximately two dozen Madison bars issued a press release announcing that they were ending all drink specials after 8:00 p.m. on Friday and Saturday nights.[5]  Compl. ¶ 60 & Exs. 2, 3.  Participants in this agreement included defendants Richard Lyshek and Jay Wanserski, both of whom owned bars in Madison.  Compl. ¶ 61.  Defendant

---

[5]This agreement was the subject of two previous lawsuits in which Uhr participated as an attorney.  In the first case, Uhr represented a group of plaintiffs who brought Wisconsin state-law antitrust claims against the bars involved in the agreement.  *See Eichenseer v. Madison-Dane Cnty. Tavern League, Inc.*, 748 N.W.2d 154 (Wis. 2008).  The Wisconsin Supreme Court ultimately affirmed summary judgment for the defendants on the ground that the bars were immune from antitrust liability because they were acting solely in response to pressure from city officials to "police themselves" or face a ban on all drink specials after 8:00 p.m. every day of the week.  *Id.* at 722-23, 727-30.  While *Eichenseer* was on appeal, Uhr, again acting as an attorney, brought a similar case in federal court.  *See Dougherty v. Tavern League of Wis., Inc.*, No. 05-CV-0584 (W.D. Wis. filed Oct. 5, 2005).  The *Dougherty* plaintiffs ultimately stipulated to dismissal with prejudice in October 2008.  *Id.* Docket No. 89.

Rick Petri, a Madison attorney and longtime member of a Robert Wood Johnson Foundation subcommittee concerning alcohol policy, was involved in organizing and implementing the agreement.  Compl. ¶¶ 17, 62, 69.  Uhr alleges that the University of Wisconsin facilitated the agreement and that the University's efforts were part of a program administered by defendant Richard Yoast of the American Medical Association and funded by a grant from the Robert Wood Johnson Foundation.  Compl. ¶¶ 65-68.  In addition, Uhr alleges a separate 2002 incident in which Petri facilitated a meeting among licensed establishments near Camp Randall Stadium for the purpose of limiting output at outdoor beer tents during home football games.  Compl. ¶ 63 & Ex. 4.

Uhr also alleges that, in 2008, RHI contracted with Downtown Madison Inc. ("DMI"), a Madison trade association that is a member of defendant IDA. Compl. ¶ 70.  Petri is a member of DMI's board.  Compl. ¶ 70.  After conducting an assessment of the hospitality industry in downtown Madison, Uhr alleges, RHI recommended that bars and restaurants enter into marketing covenants to limit drink specials.  Compl. ¶ 71.  Uhr alleges that Lyshek, Wanserski, and Petri participated in RHI's 2008 Madison activities, Compl. ¶ 72, and that defendants NBWA and WSWA are involved in monitoring establishments in Madison to ensure compliance with the price-fixing agreement, Compl. ¶ 73.

### 3.  Hollywood

In 2005, a group of (unidentified) licensed establishments in Hollywood, California allegedly agreed not to offer any "reduced price alcoholic beverage promotion."  Compl. ¶ 86 & Ex. 9.[6]  Uhr alleges that the agreement was facilitated by RHI and spearheaded by a woman

---

[6]The nature of the document attached to the complaint as Exhibit 9, on which Uhr

(continued...)

named Elizabeth Peterson, who is the owner of several nightclubs and a regular speaker at RHI events.  Compl. ¶¶ 86-87.

### 4.  San Diego

In August 2006, approximately 30 licensed establishments in San Diego announced that they had adopted a "community covenant" under which they agreed not to participate in promotions that encourage overconsumption or to advertise two-for-one drink specials or prices below $2.00 for any drink.  Compl. ¶ 74 & Ex. 5.  Uhr alleges that Mosher and RHI were involved in facilitating the agreement and monitoring its operation.  Compl. ¶ 77.  Referring to the agreement, an RHI staff member said that "[b]usinesses make more money because they are not selling alcohol at a loss" and "if all the bars do it they remain competitive."  Compl. ¶ 78.

Uhr also alleges that a local trade association called "Discover Pacific Beach" ("DPB") was involved in facilitating the agreement.  Compl. ¶ 77. Among the members of  DPB's board of directors were managers at Citibank San Diego and Prudential San Diego, who represented Citibank's and Prudential's interests on the board.  Compl. ¶¶ 80-81.  On this basis, Uhr has sued Citibank and Prudential in this lawsuit, alleging that these institutions benefitted financially from the nationwide price-fixing conspiracy (although he does not explain how).  Compl. ¶¶ 80-81.

### 5.  Breckenridge

In March 2008, 16 licensed establishments in Breckenridge, Colorado agreed that they would not offer "shot specials" for less than $3.00 or any drink specials after midnight.  Compl. ¶ 84 & Exs. 7-8.  Uhr alleges that RHI facilitated the agreement — and also alleges, apparently

---

[6](...continued)
apparently bases his allegations, is unclear, but it appears to be a list of conditions relating to some kind of regulatory action rather than an agreement of any kind.

by way of support, that the Breckenridge Chief of Police spoke at an RHI event in Denver in June 2010.  Compl. ¶¶ 84-85.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  But the plaintiff must do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause of action . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, the "factual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id.*

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment.  Fed. R. Civ. P. 12(d).  But the court may consider exhibits attached to the complaint and documents that are necessarily embraced by the complaint without converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).  In addition, the court may properly consider public records, including court records, on a motion to dismiss.[7] *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

---

[7]In particular, the Court has considered the RBS video, the ARM video, and the 2008 research article, all of which are referred to in the complaint, *see* Compl. ¶¶ 33, 55, 58, as well as the public records from Uhr's other antitrust cases and the exhibits attached to Uhr's complaint. The Court did not consider any other materials submitted by the parties.

*B.  Count I:  Sherman Act*

Uhr brings a claim under § 1 of the Sherman Act, 15 U.S.C. § 1.  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ."  *Twombly*, which also involved a claim under § 1 of the Sherman Act, makes clear that a conclusory allegation of conspiracy does not suffice.  Instead, "stating [a § 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id.* at 556-57.

Uhr alleges that defendants engaged in a nationwide price-fixing conspiracy under which they agreed to — or encouraged others to agree to — stop offering drink specials.  As discussed above, Uhr has alleged isolated instances of local price-fixing agreements in other states.  But Uhr does not allege that he ever bought a drink in those other states from one of the members of those local conspiracies.  Instead, Uhr relies on his allegation that he purchased drinks from Applebee's, Chili's, Fuddruckers, and Famous Dave's in the Twin Cities.[8]  Compl. ¶ 88.  The critical question, then, is whether Uhr has alleged sufficient facts showing that Applebee's, Chili's, Fuddruckers, and Famous Dave's restaurants in Minnesota were part of a price-fixing conspiracy.

---

[8]Uhr also alleges that, "[u]pon information and belief," he has purchased alcohol from other establishments that are participants in the charged conspiracy.  Compl. ¶ 88.  This vague allegation does not add anything to his more specific allegations of purchases, however.

Uhr alleges that these restaurants agreed to participate in ARM training administered by the School of Public Health at the University of Minnesota.  Based on their participation in this training, Uhr alleges that they conspired to fix the prices of drinks.  But the gulf between the facts that Uhr alleges and the conclusions that Uhr draws is vast, and it is unbridged by reasonable inferences or even common sense.

The first problem is that, as Uhr admitted at oral argument, there is nothing illegal about public-health experts at a university urging bars and restaurants not to offer drink specials because such specials encourage excessive drinking and are bad for public health.  And as Uhr also admitted, even if some of the bars and restaurants are persuaded by the university to stop offering drink specials, there would be no Sherman Act violation because the bars and restaurants would be acting individually, and not pursuant to an agreement.  Indeed, an allegation that certain bars and restaurants decided to stop offering drink specials in response to a recommendation from a university would *undermine* the notion that the bars and restaurants were conspiring with each other by providing an obvious, non-collusive explanation for the bars' and restaurants' behavior.  As the ARM video emphasizes, bars and restaurants face potentially ruinous liability under dram shop laws if they serve alcohol to underage or intoxicated patrons. It would be as if, in *Twombly*, the plaintiffs had alleged not only the parallel conduct that the Supreme Court found insufficient, but had also alleged that disinterested and respected outsiders had independently urged the defendants to act as they did to avoid huge legal liability.  That additional allegation would only have hurt the *Twombly* plaintiffs' case — a case that was deemed insufficient by the Supreme Court even in the absence of such an allegation.

When asked at oral argument to explain how the allegations in the complaint differ from what even Uhr admits is perfectly legal behavior — that is, bars and restaurants independently deciding not to offer drink specials in response to a recommendation from an academic institution — Uhr argued that the idea for the ARM program did not originate with the University of Minnesota, but was rather the brainchild of the hospitality industry.  This claim is apparently the basis of Uhr's contention that the ARM program was a cover for price fixing. Compl. ¶ 56.

Even if Uhr had included such an allegation in his complaint — and, as noted below, he did not — the leap between that allegation and an illegal conspiracy would be enormous.  To infer a conspiracy, one would have to infer that: (1) in order to provide cover for price fixing, people in the hospitality industry decided to ask a major public university to create an alcohol-training program and conduct a research study large enough to provide such cover; (2) the university agreed to this request and, over a period of years, managed to procure funding from a major philanthropic organization, design the program — which, it should be noted, does not even require, but merely recommends, that businesses discontinue drink promotions — and conduct the study; and (3) the participants in the study knew that this was all cover for a price-fixing agreement reached years earlier.[9]  Uhr's allegation is facially preposterous, and, without some "factual enhancement" to support this far-fetched scenario, Uhr's claim "stops short of the line between possibility and plausibility."  *Twombly*, 550 U.S. at 557.

---

[9]The complaint does not allege when the ARM program was first conceived, but any conspiracy to get the University to create the ARM program as a cover for price fixing must have been formed before the ARM video was produced in 1997.  As discussed earlier, the training that was part of the study was conducted from September 2002 to August 2004.

Uhr, however, includes no such "factual enhancement."  Indeed, he does not even allege that the hospitality industry *asked* the University to develop and implement the ARM program, much less identify who those people are, when they made their request, or how they are connected to anyone at Applebee's, Chili's, Fuddruckers, or Famous Dave's.  Instead, he generally alleges that people in the hospitality industry were involved in the development of the ARM program, that industry people appear in ARM training materials, and that all of the ARM trainers had experience in the hospitality industry.  But these allegations are entirely consistent with the far more rational inference that researchers in the University's Alcohol Epidemiology Program independently decided to create an alcohol-training program and consulted people in the hospitality industry in the design and implementation of that program (which, in fact, is exactly what the 1997 ARM video and the 2008 research article say about the ARM program).  After all, the researchers were concerned about the sale of alcohol in the hospitality industry; it would have been foolish for them *not* to consult with the industry in designing the program or to ask people with experience in the industry to conduct the training.

Rather than supporting Uhr's implausible inference of a hidden price-fixing conspiracy, the facts alleged by Uhr are far more consistent with the inference that everybody involved in the ARM program was doing exactly what they appear to have been doing:  The University researchers were, in fact, conducting a study regarding means to combat the excessive use of alcohol; the University researchers did, in fact, consult people in the industry that they were studying in order to better design and implement their study; the participating bars and restaurants were, in fact, motivated to take part in the study because of their concern about dram-shop liability; and the participants in the study each, in fact, made a unilateral decision about

-18-

whether and to what extent to implement each of the study's many recommendations. *Cf. Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) ("Sotheby's and Christie's have an independent interest in not selling forgeries because of potential damage to their reputations, not to mention legal liability. . . . Thus, while Kramer may believe the defendants conspired to keep Pollock paintings off the market, the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy."), *cited with approval in Twombly*, 550 U.S. at 566-67.

Uhr tries to save his claim by pointing to his allegation that, in course of creating the ARM program, the University talked to Peters and Mosher, who are connected to RHI, which is connected to price-fixing agreements in various locales.  But even assuming that Uhr has sufficiently alleged that RHI has organized price-fixing agreements in other places, Uhr's allegation that the University talked to Peters and Mosher in the course of designing and implementing the ARM program is not enough to show that the ARM program was itself unlawful.  The mere fact of contact between University researchers, on the one hand, and Peters and Mosher, on the other hand, is not a sufficient basis to infer that the ARM program was designed as a cover for price fixing.  Moreover, there is no allegation that the University created the ARM program at Peters's and Mosher's behest, which means that Uhr's allegations about Peters and Mosher are no more effective in creating a plausible claim of conspiracy than his allegations about consultations with unnamed people in the hospitality industry.

Uhr's claims regarding a Minnesota conspiracy involving Applebee's, Chili's, Fuddruckers, and Famous Dave's also fails because his allegations about these restaurants' actual price fixing — and his allegations about the damages that he allegedly suffered as a result

of the price fixing — are so vague as to fail to meet the standards of Fed. R. Civ. P. 8.  Uhr

admitted, at oral argument, that he does not know whether any of the restaurants that he has sued

have failed to offer him a drink special because of their participation in the ARM program.  This

is at odds with his allegation — apparently made in violation of Fed. R. Civ. P. 11 — that, "upon

information and belief," these restaurants "eliminate[d] or reduce[d] the offering of drink

discounts as a result of their involvement in ARM."  Compl. ¶ 56.  Even accepting this allegation

as true despite Uhr's admission that he has no basis for it, Uhr's admission highlights the factual

insufficiency of his antitrust claim.[10]

Uhr, of all people, should know when and where he purchased his drinks; indeed, as

between him and defendants, Uhr is the only one who could know.  And Uhr should also know

whether he was offered a drink special when he purchased his drinks.  Nevertheless, Uhr fails to

include any such factual matter in his complaint.  Although he acknowledges that the Twin

Cities have 20 Applebee's restaurants, 10 Chili's restaurants, and 15 Famous Dave's restaurants,

Uhr does not identify the location of any Applebee's, Chili's, or Famous Dave's where he

purchased a drink.  Nor does he identify *when* he purchased a drink at any of these restaurants

(or at the one Fuddruckers).  Indeed, Uhr's failure to identify when he purchased his drinks

means that he has not even alleged parallel conduct, which makes his conspiracy allegation even

weaker than that found insufficient in *Twombly*.  And Uhr does not allege — because he

---

[10]Uhr's only basis for alleging that the Minnesota restaurants curtailed drink specials
appears to be the fact that they participated in ARM training.  But the fact that a restaurant
participated in ARM training does not mean that the restaurant eliminated or reduced drink
specials.  As discussed above, ARM participants were not required to eliminate or reduce drink
specials; instead, curtailing drink specials was one of 18 recommendations presented to them by
the University of Minnesota.  A substantial percentage of the ARM participants *rejected* the
recommendation that drink specials be curtailed, and Uhr does not know whether the restaurants
where he bought his drinks were among this group.

admittedly does not know — that any of these restaurants were failing to offer drink discounts at the time that he purchased his drinks.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  In the context of this case, common sense dictates that Uhr should be able to allege when and where he purchased his drinks and whether the restaurants at which he purchased his drinks were offering drink specials at the time.  Uhr's failure to do so renders his claim that these restaurants engaged in price fixing implausible.

Uhr's § 1 claim against the remaining defendants fares no better.  To begin with, Uhr's only basis for bringing the remaining defendants into this lawsuit is that they were allegedly part of a nationwide conspiracy that harmed Uhr when he purchased drinks at restaurants in Minnesota.  But as Uhr has failed to adequately allege any conspiracy in Minnesota, Uhr necessarily has failed to adequately allege any conspiracy involving the remaining defendants.  *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.7 (1986) ("However one decides to describe the contours of the asserted conspiracy — whether there is one conspiracy or several — respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. . . . That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury.").

But even if Uhr had adequately alleged a conspiracy in Minnesota, he has not alleged facts plausibly suggesting that such a conspiracy is part of a larger, nationwide conspiracy.  As noted, the only connection between Minnesota and the nationwide conspiracy is the allegation

that, in the course of designing the ARM program, the University of Minnesota spoke to Peters and Mosher.  Even if this were enough to show that there was a conspiracy to fix prices in Minnesota — which, for the reasons discussed above, it is not — the fact that researchers at the University of Minnesota had contact with Peters and Mosher does not mean that the restaurants who participated in the University's study conspired with every bar and restaurant with which either Peters or Mosher has had contact in the past.

Likewise, Uhr's ability to point to connections between people involved in the various alleged local conspiracies does not mean that the local conspiracies are part of a single nationwide conspiracy.  The fact (if it is a fact) that RHI encouraged bar owners in Pacific Beach, California to agree to fix prices in 2006 and then encouraged bar owners in Breckenridge, Colorado to agree to fix prices in 2008 does not mean that the bar owners in Pacific Beach reached an agreement with the bar owners in Breckenridge.  As Uhr admitted at oral argument, there is no reason why bar owners in one state would agree to fix prices with bar owners in another state.  After all, they operate in totally different markets.

It is true, as Uhr argues, that conspirators need not know one another in order to be involved in the same conspiracy.  *United States v. Barraza Cazares*, 465 F.3d 327, 333 (8th Cir. 2006).  But the conspirators must nevertheless share a common purpose or objective.  *See United States v. Faulkner*, 636 F.3d 1009, 1021 (8th Cir. 2011).  Here, the alleged retail conspirators in one locale share no common purpose with the alleged retail conspirators in the other locales. They are not part of a single chain of distribution, they cannot affect prices in each other's markets, and they do not profit from each other's activities.[11]

_____

[11]It is also worth noting that Uhr cannot provide any plausible reason — other than
(continued...)

Because Uhr has failed to allege a plausible Minnesota conspiracy or any plausible connection between any such conspiracy and the allegedly conspiratorial activities in other states, the Court grants defendants' motions to dismiss Count I.

### C.  Count II:  RICO

Uhr also brings a claim under 18 U.S.C. § 1962(c), part of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.  Section 1962(c) makes it illegal "to conduct or participate" in an "enterprise's affairs through a pattern of racketeering activity . . . ."  The elements of a claim under § 1962(c) are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

Uhr alleges that the "enterprise" in this case is the nationwide conspiracy to fix retail alcohol prices.  Compl. ¶ 101.  As discussed above, however, Uhr has failed to plausibly allege (1) the existence of a Minnesota conspiracy, (2) any facts suggesting that a Minnesota conspiracy was part of the nationwide conspiracy, or indeed (3) the existence of the nationwide

---

[11](...continued)
completely unsupported speculation about unspecified kickbacks — why the distillers, wholesalers, and distributors that are a large part of RHI's board would want to fix retail alcohol prices and thereby reduce the amount of alcohol being sold.  As Uhr admitted at oral argument, such price fixing would likely hurt these businesses' bottom lines.  *Cf. Matsushita*, 475 U.S. at 596-97 ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Kramer*, 890 F. Supp. at 256 ("The complaint fails to support the existence of a conspiracy because it presents no coherent theory of participation by Sotheby's or Christie's in the alleged conspiracy. . . . Sotheby's and Christie's lack a rational motive to conspire with the Pollock-Krasner defendants to establish a monopoly.").

conspiracy.  Without any plausible allegations of a nationwide conspiracy, Uhr's RICO claim lacks the essential element of an enterprise.[12]

Uhr's RICO claim also fails because he has failed to properly allege any predicate acts of racketeering activity.  Uhr alleges that the predicate acts in this case are mail and wire fraud.  *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include mail and wire fraud).  In order to make out a claim of mail or wire fraud, however, Uhr must allege: "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) [that] the mail [or interstate wiring] was used in furtherance of some essential step in the scheme."[13]  *United States v. McKanry*, 628 F.3d

---

[12]Even if Uhr had properly alleged a nationwide conspiracy, the lack of any plausible connection between that conspiracy and the Minnesota restaurants patronized by Uhr means that Uhr has not been "injured in his business or property by reason of a violation of section 1962," which is necessary for him to recover under RICO.  18 U.S.C. § 1964(c); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (a plaintiff can sue under § 1964(c) only if the alleged RICO violation was a proximate cause of the plaintiff's injury).

[13]Several older Eighth Circuit cases state that mail and wire fraud do not require proof of a misrepresentation of fact and that therefore "a RICO claim based upon the predicate acts of mail or wire fraud does not require an allegation of a misrepresentation or common law fraud." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995).  But these older cases must be read in light of *Neder v. United States*, 527 U.S. 1 (1999), which held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."  *Id.* at 25.

Nevertheless, there is at least one post-*Neder* Eighth Circuit RICO case that persists in stating that a factual misrepresentation is not a necessary element of mail and wire fraud.  *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 918 (8th Cir. 2001) ("A plaintiff may, but need not, allege that a defendant made misrepresentations of fact.").  *Abels* can be reconciled with *Neder*, however, by recognizing that mail and wire fraud do not require a misrepresentation about an existing fact, but also encompass material false promises about the future.  *See Neder*, 527 U.S. at 24 (discussing *Durland v. United States*, 161 U.S. 306 (1896)).  In any event, more recent Eighth Circuit cases seem to recognize that, to allege a predicate act of mail or wire fraud for purposes of RICO, a plaintiff must allege a material falsehood.  *See Schoedinger v. United Healthcare of Midwest, Inc.*, 557 F.3d 872, 878-79 (8th Cir. 2009) ("While a plaintiff's

(continued...)

-24-

1010, 1017 (8th Cir. 2011) (citation and quotations omitted).  Fed. R. Civ. P. 9(b), which

requires that fraud be pleaded with particularity, applies to allegations of mail and wire fraud

when pleaded as predicate acts for a RICO claim.  *See Murr Plumbing, Inc. v. Scherer Bros. Fin.*

*Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995).

Uhr's complaint nowhere identifies the scheme to defraud or any material false

representations or promises.  Instead, Uhr's allegations of mail and wire fraud are simply

conclusory recitations of the elements of these crimes.  *See* Compl. ¶ 99 ("Defendants and others

have voluntarily and intentionally devised and engaged in a scheme to defraud another of money

and have engaged in specific fraudulent acts pursuant to that scheme with the intent to defraud");

Compl. ¶ 101 ("Defendants and other persons engaged in the charged conspiracy through a

continuous and related pattern of racketeering activity, including multiple violations of the

federal mail fraud and wire fraud statutes.").  This is patently insufficient under Fed. R. Civ.

P. 8(a)(2), much less Fed. R. Civ. P. 9(b).

When pressed at oral argument to identify the scheme to defraud, Uhr argued that a price-

fixing conspiracy is itself a scheme to defraud because consumers have a reasonable expectation

that the businesses they patronize are not engaging in illegal price fixing.  Uhr cites no case to

support this proposition, which is not surprising.  If Uhr were correct, every price-fixing

conspiracy would automatically constitute a RICO violation.[14]  Congress clearly did not intend

---

[13](...continued)
detrimental reliance is not an element of a RICO claim predicated on mail fraud, 'materiality of
falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.'" (quoting
*Neder*, 527 U.S. at 25)).

[14]Indeed, because consumers presumably have a reasonable expectation that the
businesses they patronize are not engaging in *any* illegal conduct, the violation of just about *any*
(continued...)

that violations of the Sherman Act — which, after all, are not predicate offenses under RICO — automatically give rise to RICO liability. *Cf. Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 631 (S.D.N.Y. 2006) ("All businesses use interstate mail or wires.  Congress did not intend that every trademark dispute would be brought under RICO.").  The Court therefore grants defendants' motions to dismiss Uhr's RICO claim.

Because Uhr has failed to assert viable claims despite having had three chances to do so, his complaint is dismissed with prejudice.[15]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Plaintiff's motion to amend [Docket No. 133] is GRANTED.

2.   Defendants' motions to dismiss [Docket Nos. 10, 34, 44, 46, 63, 66, 73, 75, 83, 86, 92, 94, 99, 102, 107, 110, 128, 142, 147, 152] are GRANTED.

---

[14](...continued)
federal or state law could, on Uhr's theory, constitute an act of mail or wire fraud and lead to RICO liability.

[15]Relying on Uhr's involvement in the *Eichenseer* and *Dougherty* actions (discussed above), defendants Jay Wanserski and Rick Petri move for sanctions on the ground that Uhr's claims against them are clearly barred by res judicata and collateral estoppel.  Although the Court is sympathetic to these defendants' frustration with Uhr, the Court cannot find, on the current record, that Uhr was in privity with his clients when he represented them in *Eichenseer* and *Dougherty*, particularly in light of Uhr's assertion that his representation ended before either case was concluded.  *See Irving v. Dormire*, 586 F.3d 645, 647-48 (8th Cir. 2009) (both res judicata and collateral estoppel require privity); *Pasko v. City of Milwaukee*, 643 N.W.2d 72, 78 (Wis. 2002) (res judicata requires privity); *State v. Mechtel*, 499 N.W.2d 662, 667 (Wis. 1993) (collateral estoppel requires privity).  Notably, neither Wanserski nor Petri have addressed the issue of whether and under what circumstances an attorney may be in privity with his client for preclusion purposes.  The Court therefore denies the motions for sanctions.

3.      The second amended complaint [Docket No. 136] is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

4.      Defendant Jay Wanserski's motion for sanctions [Docket No. 177] is DENIED.

5.      Defendant Rick Petri's motion for sanctions [Docket No. 184] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 14 , 2011                           s/Patrick J. Schiltz
                                                                      Patrick J. Schiltz
                                                                      United States District Judge